**Nelson Bunker HUNT, W. Herbert Hunt and, Lamar Hunt, Plaintiffs,**

**v.**

**MOBIL OIL CORPORATION, Texaco, Inc., Standard Oil Company of California, the British Petroleum Company, Ltd., Shell Petroleum Company, Ltd., Exxon Corporation, Gulf Oil Corporation, Occidental Petroleum Corporation, Grace Petroleum Corporation and Gelsenberg, A.G., Defendants,**

**and**

**Amerada Hess Corporation, Continental Oil Company, Hispanoil and Marathon Oil Company, Additional parties to Arbitration and Motion to Confirm.**

**75 Civ. 1160 (EW).**

United States District Court, S.D. New York.

Feb. 23, 1987.

See also, 583 F.Supp. 1092.

ney, III, of counsel), for Shell Petroleum Co., Ltd.

Charles O. Murray, III, Chevron U.S.A. Inc., San Ramon, Cal., Charles F. Kazlauskas, Jr., Lawrence R. Jerz, Texaco Inc., White Plains, N.Y., Kaye, Scholer, Fierman, Hays & Handler, New York City (Randolf S. Sherman, of counsel), for Texaco Inc.

Kevin T. O'Reilly, New York City (Randall S. Strange, of counsel), for Grace Petroleum Libya Inc.

Windels, Marx, Davies & Ives, New York City (Daniel V. Duff, Jr., of counsel), for Veba Oel AG.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Kenneth H. Holms, Mark Schwartz, of counsel), for Conoco, Inc.

Sherman & Sterling, New York City, for Hispanoil.

Hirschkop & Grad, P.C., Alexandria, Va. (Philip J. Hirschkop, Jonathan R. Mook, of counsel), Levy, Gutman, Goldberg & Kaplan, New York City (Jeremiah S. Gutman, Eugene N. Harley, of counsel), for plaintiffs.

Shea & Gould, New York City (Bruce A. Hecker, Joseph Ferraro, of counsel), for British Petroleum Co., Ltd.

Lord, Day & Lord, New York City (Gordon B. Spivack, David H. Marks, Carolyn T. Ellis, of counsel), for Chevron Corp. and Gulf Oil Corp.

Pillsbury, Madison & Sutro, San Francisco, Cal. (Thomas E. Haven, of counsel), for Chevron Corp.

Sullivan & Cromwell, New York City (Robert M. Osgood, William H. Knull, III, of counsel), Albert P. Lindermann, Jr., Exxon Corp., New York City, for Exxon Corp.

Howrey & Simon, Washington, D.C. (A. Duncan Whitaker, P.C., Mark D. Wegener, of counsel), R.D. Vock, Mobil Oil Corp., New York City, for Mobil Oil Corp.

Phillips, Nizer, Benjamin Krim & Ballo, New York City (Louis Nizer, Robert R. Salman, Janet P. Kane, of counsel), for Occidental Petroleum Corp.

Cravath, Swaine & Moore, New York City (John R. Hupper, Douglas D. Broadwater, of counsel), Davis, Markel, Dwyer & Edwards, New York City (Thomas J. Swee-

## OPINION

EDWARD WEINFELD, District Judge.

In March 1975, plaintiffs, Nelson Bunker Hunt, Herbert Hunt and Lamar Hunt, ("the Hunts,") independent oil producers, commenced this action against the world's seven largest oil producing companies: Exxon, British Petroleum ("BP"), Shell, Mobil, Texaco, Chevron and Gulf, ("the Majors"), Occidental Petroleum Corporation ("Occidental") and six other independent oil companies ("the Independents") charging them with antitrust violations and breach of an agreement. The basic controversy centered about the Libyan Production Agreement ("LPA"), entered into in 1971 among the Hunts, the Majors and the Independents, designed to present a united front against increasingly aggressive action by the Libyan government. Under one of its terms, the parties agreed to share the burdens of production cutbacks by the Libyans by providing the cutback party with replacement oil at producers tax paid cost.

Following extensive discovery, which included oral depositions of parties and witnesses taken in the United States and in

various foreign countries and a series of pretrial motions and interlocutory appeals, this Court, after an eight-week trial, with a record of more than 7,000 pages and hundreds of exhibits, dismissed the Hunts' antitrust claims against the defendants upon the merits and the defendants' counterclaims for failure of proof. The final judgment entered in November 1978 provided that the Hunts' breach of contract claim, the Majors' and the other defendants' defenses thereto and their counterclaims, which were not resolved in the action, were subject to arbitration as provided for by the LPA. Familiarity is assumed as to that disposition,[1] and other related matters.[2]

The arbitration proceeding was one of delay and continued controversy. More than two years were consumed by a screening process, as arbitrators proposed by one party were rejected by one or more of the other parties before a panel of three arbitrators was finally designated in May 1981. The panel consisted of Kenneth W. Dam, Professor of Law and Assistant Provost of the University of Chicago, Richard J. Medalie, a senior partner in the Washington, D.C. law firm of Friedman & Medalie, and Richard C. Allison, a senior partner in the law firm of Reid & Priest of New York City. Thereafter, another six months were consumed with procedural matters. Originally, there were separate arbitrations as to each separate claimant; finally, the parties agreed upon a consolidated proceeding. The issues in the arbitration included not only the contract claims among the Hunts, the Majors and Occidental, but also extended to those of the eight independent oil companies who were also signatories to the LPA. At some stage of the proceeding the claims or cross-claims of all the Independents, except the Hunts and Occidental, were settled and the arbitration was continued as to all others.

The presentation of evidence did not commence until December 1981, with the Hunts going forward first with their case-in-chief; they rested their case in June 1982. The Majors and Occidental then moved to dismiss most of the Hunts' claims. Prior to the date scheduled for argument of those motions, the parties were notified that arbitrator Dam had been nominated by the President as Deputy Secretary of State of the United States, a nomination that required Senate confirmation. They were also informed that pending the normal delay in confirmation, resulting from security, financial and other governmental checks, Dam was free to participate in the determination of the pending motions. All parties agreed that Dam should continue to serve in the determination of those motions, and argument was heard by the panel over a three-day period. On September 5, 1982, the panel unanimously granted several of the Majors' motions and dismissed some but not all of Hunts' claims. Dam's resignation became effective on September 22, 1982.

Thereafter, on October 14, 1982, the Hunts, despite their prior written consent that the claims already heard be decided by the then constituted panel, demanded replacement of the entire panel and a de novo hearing on all claims, including those already decided by the panel, of which Dam had been a member. The basis for this demand by the Hunts was an allegation that each of the arbitrators had failed to disclose actual or potential conflicts of interest. The Hunts declared that unless their position was accepted, they would refuse to proceed with the arbitration. The Majors, Occidental and other parties to the arbitration disputed the Hunts' allegations against the arbitrators. With matters at a standstill, the Majors and the others moved this Court in December 1982 for an order to compel the Hunts to continue with the arbitration, whereupon the Hunts countered by filing an action in the Supreme

---

1. *Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195 (S.D. N.Y.1978), *aff'd without opinion*, 610 F.2d 806 (2d Cir.1979).

2. *Hunt v. Mobil Oil Corp.*, 583 F.Supp. 1092 (S.D.N.Y.1984); *Hunt v. Mobil Oil Corp.*, 557 F.Supp. 368 (S.D.N.Y.), *aff'd on opinion below*, 742 F.2d 1438 (2d Cir.1983); *Hunt v. Mobil Oil Corp.*, 444 F.Supp. 68 (S.D.N.Y.1977); *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10 (S.D.N.Y.1975), *aff'd*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

Court of the State of New York against the Majors and Occidental. In that action the Hunts, among other matters, sought to vacate the award that had dismissed some of the Hunts claims, based upon alleged "misconduct" by the arbitrators consisting of a failure to disclose actual or potential conflicts of interest.

After argument and briefing by counsel, this Court, in February 1983, enjoined the Hunts from prosecuting the aforesaid State Supreme Court action and directed them to continue with the arbitration.[3] Undaunted by that order, which was affirmed on appeal,[4] the Hunts commenced two additional state actions. The first action was commenced in the New York State Supreme Court against the AAA and Grace Petroleum Libya Inc. (an Independent not named in the first suit). The Hunts claimed the AAA had (1) violated its fiduciary duty to administer properly the arbitration; (2) failed to render an accounting of fees paid to the arbitrators for their services; (3) permitted the arbitrators to charge excessive fees; and (4) failed to disclose facts with respect to alleged conflicts of interest and appearances of impropriety by one or more of the arbitrators. In the second action, instituted in the Superior Court of the District of Columbia against Dam, the former arbitrator, the Hunts alleged that Dam charged exorbitant fees, double billed, made improper charges of expenses and sought an accounting for all fees received during his services as an arbitrator. In addition, the Hunts sought to examine Dam as to his alleged conflict of interest. This Court stayed those two State actions and on April 24, 1984 again ordered the Hunts to proceed with the arbitration.[5] Specifically, in that ruling, this Court noted that upon rendition of a final award by the arbitrators, the Hunts, or any other aggrieved party, were free to raise any claim that the arbitrators acted improperly, were involved

in conflicts of interest or engaged in any conduct that impaired the validity of any award; similarly, any alleged impropriety by the AAA that tainted the award could be raised.[6] Thereafter, Professor David R. Herwitz of Harvard Law School was designated as the third arbitrator, following which the arbitration proceeded until all parties rested.

In all, sixty-one hearings were held from the commencement of the arbitration in May 1981, to the final hearing on September 20, 1985. The transcript of the hearings consists of 13,671 pages and many hundreds of documents were received in evidence. The parties submitted 439 interim and final briefs, statements and memoranda touching upon issues in the arbitration, totalling 8,058 pages. In addition to oral testimony, numerous affidavits and extensive transcripts of depositions and testimony taken in the antitrust suit were submitted in the arbitration proceeding. On September 30, 1985, the arbitrators rendered an unanimous award, with some rulings in favor of the Hunts and others in favor of other parties to the arbitration, as follows:

| | Owed to the Hunts by: | Owed by the Hunts to: |
| --- | --- | --- |
| British Petroleum | $ ——— | $ 131,384 |
| Chevron | ——— | 576,423 |
| Exxon | ——— | 2,599,095 |
| Mobil | ——— | 368,116 |
| Shell | ——— | 221,513 |
| Gulf | 706,244 | ——— |
| Texaco | 23,551 | ——— |
| Occidental | 865,430 | ———[7] |

The Majors and Occidental now move to confirm the arbitrators' award and for the entry of judgment in accordance with the dollar amounts set forth above, with interest from the date of the award until the

3. *Hunt v. Mobil Oil Corp.,* 557 F.Supp. 368 (S.D. N.Y.), *aff'd on opinion below,* 742 F.2d 1438 (2d Cir.1983).

4. *Hunt v. Mobil Oil Corp.,* 742 F.2d 1438 (2d Cir.1983).

5. *Hunt v. Mobil Oil Corp.,* 583 F.Supp. 1092 (S.D.N.Y.1984).

6. *Id.* at 1095.

7. Whitaker Aff., Ex. 3, Award of Arbitrators (September 30, 1985).

date of confirmation and with interest thereafter as determined by the Court. The movants also request that the Court allocate the AAA's administrative fees and costs and the arbitrators' compensation and expenses in accordance with the formula set forth in the award and in the dollar amount to be provided by the AAA pursuant to the award.

The Hunts cross-move to vacate the awards, and in addition seek discovery in support of their motion to vacate, and an evidentiary hearing. Conoco Inc., Grace Petroleum Corporation and Veba Oil A.G. ("Conoco, et al.") oppose the motion to confirm the award, but only with respect to the imposition of arbitration costs upon them, on the ground that they were released from payment of such costs by settlement agreements entered into during the course of the arbitration. In response, the Majors and Occidental argue that Conoco, et al. were active participants in the arbitration proceeding until the releases were executed, and accordingly they are properly subject to the imposition of costs to the date of release.

The Hunts seek to vacate the award pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("The Act") on four separate grounds: (1)(a) "evident partiality" or "corruption" by the arbitrators, aided and abetted by the AAA—essentially, failure to disclose relationships of the arbitrators to persons constituting alleged actual or potential conflicts of interest, and (b) misconduct with respect to fees;[8] (2) refusal of the arbitrators to hear evidence pertinent and material to the controversy;[9] (3) the arbitrators exceeded their powers by awarding attorneys' fees to prevailing parties;[10] and (4) imperfectly exercised their powers by issuing an incomplete award.[11]

■ The burden of proof to establish these claims rests upon the Hunts.[12] Preliminarily, it is required to state the obvious, which the Hunts and their counsel ignore, that the repetitive and perjorative charges of partiality and fraudulent and corrupt conduct levelled at the arbitrators, however satisfying this may be to counsel and their clients, are not a substitute for evidentiary proof. A constant drumfire of charges, lacking factual support, does not warrant granting the Hunts' motion for the taking of depositions of the arbitrators or for an evidentiary hearing. To invoke the discovery and deposition process in a search for evidence to support the charges would be tantamount to requiring a judge to submit to an oral deposition by a nonprevailing party where the judge had refused to recuse himself on allegations of personal bias under 28 U.S.C. § 455.[13] Such a discovery process would negate the concept of arbitration as a relatively quick means of

---

**8.** 9 U.S.C. § 10(b).

**9.** 9 U.S.C. § 10(c).

**10.** 9 U.S.C. § 10(d).

**11.** *Id.*

**12.** *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 700 (2d Cir. 1978); *Reed & Martin, Inc. v. Westinghouse Elec. Corp.,* 439 F.2d 1268, 1275 (2d Cir.1971) ("the burden of proof ... rests upon the party asserting bias"); *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.,* 375 F.2d 577, 582 (2d Cir.1967).

**13.** The Court is aware that our Court of Appeals has acknowledged that the discovery procedures of the Federal Rules of Civil Procedure are generally applicable to Title 9 proceedings. However, the Court made it clear that the proce-

dure should be invoked only under judicial supervision and "limited to situations where clear evidence of impropriety has been presented." *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 702 (2d Cir.1978). The instant case clearly is not such a situation; on the contrary, it is an attempt to use, more correctly to abuse, the discovery process as a fishing expedition which would needlessly further delay the proceeding. *Cf. Samuels v. Beheer, B.V.,* 500 F.Supp. 1357, 1362 (S.D.N.Y. 1980) (citing *Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.,* 550 F.2d 1320, 1327 (2d 1977)), *aff'd,* 661 F.2d 910 (2d Cir.1981); *Reichman v. Creative Real Estate Consultants, Inc.,* 476 F.Supp. 1276, 1286 (S.D.N.Y.1979) ("'Post verdict' examinations of a judicial or quasi-judicial officer, be he judge, juror, or arbitrator, for the purpose of impeaching his decision, are inherently suspect, indeed, roundly condemned, in our system of jurisprudence.").

dispute resolution,[14] and would only protract and delay the termination of the arbitration proceeding. Thus, the arbitration, instead of serving as an efficient and expeditious means of dispute resolution, an essential ingredient of the parties' agreement to forego the judicial process, would, if discovery and an evidentiary hearing were ordered, mean inordinate delay. Unfortunately, such delay has marred this arbitration, which is now in its eighth year. The voluminous affidavits and massive exhibits submitted on these motions total over two thousand five hundred pages,[15] and, stripped to essentials, furnish an adequate factual basis for disposition of the issues presented by the parties' respective motions and cross-motions. The material facts upon which the Hunts assert their claims of disqualification of the arbitrators are not in dispute. What is disputed are the inferences to be drawn therefrom upon which the ultimate issues of "evident partiality," "corruption" and other claims are to be decided.

The matters considered by the arbitrators under the respective claims, cross-claims and counterclaims of the parties centered about a far-flung industry engaged in global operations of exploration, development, refining and distribution of oil; the Libyan Production Agreement; the various actions of the Libyan government with respect to oil concessions granted to the Hunts and shared by British Petroleum; the rights of parties to "substitute crude oil" and "back-up oil"; oil under the "pre-existing customer clause"; the rights un-

der the "dimes clause" or "cash option"; the calculation of crude oil or the "barrel for barrel" entitlements and other rights and obligations of the signatories to the LPA that were activated by the Libyan Government's nationalization of the Hunts' oil producing concession in Libya. Also at issue were the Majors' and the Independents' restitution and recission counterclaims against the Hunts based upon their alleged "secret offer" to sell their entire concession to the Libyan Government, in consequence of which it was alleged the Hunts forfeited their entitlement to substitute crude oil under the LPA.[16] Under these counterclaims the Majors and the Independents sought to recapture from the Hunts the value of all oil delivered and cash paid to them after the date of the alleged concealed secret offer. The foregoing and other complex matters, as well as the number of parties, sixteen in all, and their diverse interests, obviously required arbitrators of unusual legal qualification and broad experience in complicated transactions—persons, as the parties recognized, of "distinction and experience," [17] with "legal training and expertise" [18] and "greater knowledge," based on professional experience, "than an Article III judge, or a jury." [19] As already noted, the search for such highly qualified arbitrators took more than two years.

■ Certain principles have been enunciated by our Court of Appeals in attacks upon arbitrators' impartiality and their awards. There is a "traditional reluctance

14. *Cf. Wilko v. Swan,* 346 U.S. 427, 431–32, 74 S.Ct. 182, 184–85, 98 L.Ed. 168 (1953); *Diapulse Corp. of America v. Carba, Ltd.,* 626 F.2d 1108, 110 (2d Cir.1980).

15. The Hunts' main, reply, surreply, post hearing and response briefs run to over 250 pages; in addition, the Hunt exhibits, 300 in number, which contain substantial extracts of the arbitration proceeding and other exhibits, and the affidavits, briefs and exhibits of the Majors and Occidental have resulted in a massive record of over 2500 pages. This massive, and at times discursive, record must not obscure the ultimate issue of whether the Hunts have sustained their charges of evident partiality and corruption of the arbitrators, no matter what the direction of

the disparate charges and against whom they are made.

16. *See Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195 (S.D.N.Y.1978), *aff'd without opinion,* 610 F.2d 806 (2d Cir.1979).

17. *See* Mook Aff., Ex. 8, Nadler Letter dated June 29, 1979.

18. *See* Mook Aff., Ex. 7, Ellis Letter dated June 15, 1979.

19. *Merritt Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 679 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

to inquire into the merits of an arbitrator's award or to require of an arbitrator the same demanding level of impartiality as that dictated for judges...."[20] "Evident partiality" means more than a mere appearance of bias. The Court, as have other Courts of Appeals,[21] has recognized that "often [arbitrators] have interests and relationships that overlap with the matter they are considering as arbitrators. The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator."[22]

Although the Supreme Court in *Commonwealth Coating Corp. v. Continental Casualty Co.*,[23] considered the requirements of impartiality, no definitive ruling was made as to the criteria to be applied in determining "evident partiality."[24] There was no majority ruling; indeed, there appeared a sharp difference of opinion between Justice Black, who wrote for the plurality, and Justice White, who wrote a concurring opinion, joined by Justice Marshall, as to the standards to be applied in passing upon the "requirements of impartiality." Justice White emphasized that:

The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best informed and most capable potential arbitrators.[25]

Justice Fortas, joined by Justices Harlan and Stewart, strongly dissented from what he termed the announcement of "a *per se* rule that ... has no basis in the applicable statute or jurisprudential principles."[26]

Out of the welter of plurality, concurring and dissenting opinions in *Continental*, Chief Judge Feinberg of our Court of Appeals observed that the Supreme Court certainly "did not decide that 'the standards of judicial decorum' apply equally to arbitrators."[27] In fact, subsequent to *Continental*, our Court of Appeals noted that the standard to be applied in passing upon a claim of disqualification of an arbitrator for "evident partiality," or for alleged failure to disclose information, has been held to be less stringent than those for judicial officers because "to disqualify any arbitrator who had prior dealings with one of the

---

20. *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 81 (2d Cir.1984). *See also Diapulse Corp. of America v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir.1980) (judicial review of arbitration awards is very narrowly limited); *John T. Brady & Co. v. Form-Eze Systems, Inc.*, 623 F.2d 261, 264 (2d Cir.), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980) (the narrowest reading must be given to the Arbitration Act's authorization to vacate); *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 700–01 (2d Cir.1978) (courts should not be quick to set aside an arbitrator's award).

21. *E.g., Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir.), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

22. *Florasynth v. Pickholz*, 750 F.2d 171, 173–74 (2d Cir.1984).

23. 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

24. *Id.* at 149, 89 S.Ct. at 339.

25. *Id.* at 150, 89 S.Ct. at 340 (citation omitted).

26. *Id.* at 153, 89 S.Ct. at 341.

27. *Andros Compania Maritima v. Marc Rich & Co., A.G.*, 579 F.2d 691, 699 (2d Cir.1978). *See also Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 682 (7th Cir.) (since his vote was essential to the majority, what Justice White "said the Court did not decide the Court did not decide, whatever Justice Black may have hoped."). Indeed, the Seventh Circuit in *United States Wrestling Federation v. Wrestling Div. of AAU, Inc.*, 605 F.2d 313, 319 (7th Cir.1979) treated Justice White's opinion as authoritative.

parties (to say nothing of social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all." [28]   Chief Judge Feinberg observed for the Court that under prior rulings "we have not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information," and that each case is to be decided pragmatically on "a case-by-case approach in preference to dogmatic rigidity." [29]   Were a person to be disqualified simply because he has professional or social relationships with one of the parties, this would make it virtually impossible in some instances to obtain qualified and experienced arbitrators.  This is particularly applicable to this arbitration, which involved complex issues and a large international industry in which most of the major participants, many of whom are large corporations, are involved in the arbitration.  Our Court of Appeals has held that to sustain a section 10(b) charge of "evident impartiality" against an arbitrator requires:

> a showing of something more than the mere "appearance of bias" to vacate an arbitration award.... '[E]vident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.  In assessing a given relationship, courts must remain cognizant of peculiar commercial practices and factual variances.[30]

Recently, our Court of Appeals adhered to this doctrine:

... [t]he unique role of arbitrators, whose special expertise arises from wide experience in their fields, sometimes leads to a gain of their professional knowledge and skill at the cost of the appearance of less than complete impartiality.  We generally adhere to the rule that '[t]he mere appearance of bias that might disqualify a judge will not disqualify an arbitrator.' [31]

Moreover, to set aside an award for partiality, " '[t]he interest or bias ... must be direct, definite and capable of demonstration rather than remote, uncertain or speculative.' " [32]

■ Guided by the foregoing principles and recognizing that a charge of "evident partiality" or "actual bias" may rarely be supported by direct evidence, but may be met by inferences from objective facts inconsistent with impartiality,[33] we consider whether the Hunts have sustained their burden of proof as to their various charges.  Perforce it is necessary to detail the Hunts' broadside allegations.

I.  The charge of evident partiality and corruption on the part of the arbitrators and the AAA (9 U.S.C. § 10b)

(a)  The charge against Arbitrator Richard C. Allison.

Allison was the only arbitrator designated by the AAA subject to rejection by the parties.  The Hunts' challenge to Allison goes in several directions.  First, they contend that the AAA had an inherent incentive not to reveal any possible disqualification of Allison, "which was exacerbated by an undisclosed close relationship between

**28.**  *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 83 (2d Cir.1984).  *See also Merritt Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 679–80 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

**29.**  *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 700 (2d Cir. 1978).

**30.**  *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 83–83 (2d Cir.1984).

**31.**  *Pitta v. Hotel Ass'n of New York City, Inc.,* 806 F.2d 419, 423 (2d Cir.1986) (citations omitted).

**32.**  *Sidarma Societa Italiana di Armamento Spa, Venice v. Holt Marine Indus., Inc.,* 515 F.Supp. 1302, 1307 (S.D.N.Y.) *(quoting Tamari v. Bache Halsey Stuart Inc.,* 619 F.2d 1196, 1200 (7th Cir.), *cert. denied,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980)), *aff'd without opinion,* 681 F.2d 802 (2d Cir.1981).

**33.**  *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79 (2d Cir.1984).

the AAA and Mr. Allison." The Hunts assert they learned, only after the arbitration was well under way, that shortly following Allison's appointment, Gerald Aksen, a former General Counsel and Vice President of the AAA, had joined Allison's law firm, Reid and Priest, as a partner specializing in arbitration. They contend this situation created actual or potential conflicts that should have been revealed immediately since "obviously the impartiality of both the administrative body [AAA] and the arbitration Panel is called into question when a former General Counsel and Vice President of the [AAA] is a law partner of one of the arbitrators." [34]

■ The Hunts ipse dixit that so "obviously" called into question Allison's impartiality is not apparent. This contention upon its face is so lacking in substance that it does not merit the dignity of detailed discussion. No factual item is alleged that relates to the arbitration or to Allison in his role as an arbitrator. The AAA was not a party to the arbitration; it was not an arbitrator called upon to decide issues. It was the administrator of the arbitration. It is not asserted how Aksen's former position as General Counsel to the AAA or his partnership in Reid & Priest bore on or had any relationship to any issue in the arbitration, nor is it shown that Aksen had any contact with Allison in his role as arbitrator or with the other two arbitrators with respect to any issues in the arbitration. The claim is less than trivial; it is utterly without merit. No reasonable person could conclude that Aksen, by joining Reid & Priest as a partner, affected Allison's impartiality and resulted in bias or prejudice against the Hunts and in favor of the Majors or the Independents.

Next, the Hunts allege that Allison, in listing his qualifications, omitted a number of companies represented by his firm that were engaged in oil and gas exploration, public utilities and energy development, and which provided engineering, construction and oil field services for other compa-

nies. These include Ebasco Services, Inc., Boise Cascade Corporation, and Louisiana Power & Light Company ("Louisiana Power"). Reid & Priest represented these companies, as well as many others engaged in the same type of business, and the Mitsubishi companies, referred to hereafter.

Ebasco, a wholly owned subsidiary of Ensearch Research Corporation, is one of the largest companies in the world in the field of oil and gas exploration, development and production of crude oil, natural gas and petroleum products. The Hunts emphasize that Ebasco engages in joint ventures or partnership arrangements with major energy companies around the world, including, among others, British Petroleum, Gulf, Texaco, Exxon, Socal and Mobil.[35]

Boise Cascade Corporation owns several large public utilities throughout the country and is engaged in oil exploration in many parts of the United States and the world. The Hunts assert Boise Cascade, as do other energy production companies, provide the raw materials for many oil producing companies for their operations in the United States and foreign countries. There is no allegation of any specific relationship of Boise Cascade to any participants in the arbitration with respect to any matter at issue in that proceeding.

■ The essence of the charge by the Hunts is that since Ebasco, Boise Cascade and Louisiana provided construction, engineering and oil field services or supplied materials and energy products to some of the participants in the arbitration, or were engaged in joint ventures with them, a potential conflict of interest existed which should have been, but was not, disclosed by Allison. With respect to these relationships, Allison denies that they created a "possible predisposition on my part (i) in favor of a party to the LPA arbitration, or (ii) against such a party, [and] I can state

---

34. Plaintiffs' Memorandum, November 26, 1985 at 12.

35. Mook Aff., Ex. 42, Hirschkop Letter dated October 12, 1984.

unequivocally that neither was the case."[36] This self-serving categorical denial of partiality or bias, of course, is neither controlling nor dispositive of the issue; nor is it considered by the Court.[37] However, objective facts fully establish that the failure to make disclosure did not create an actual or potential conflict of interest.[38] It is common knowledge that giant energy and public utility and oil companies, including the Majors and Independents, engage in joint ventures, participation and sharing agreements in the exploration and production of energy and oil in pursuit of their economic interests. The Hunts, as a leading independent oil producer, certainly knew this. They were not unaware that Reid & Priest represented utility, energy and oil interests, and that it was not unusual that the firm represented such clients in situations involving multiple and various gas, oil and energy interests. As Justice White noted in his concurring opinion in the *Commonwealth* case:

> [a]n arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography.[39]

Our Court of Appeals emphasized that "in giving practical meaning" to *Commonwealth Coatings'* principle of disclosure, it "has treated the obligation to which arbitrators are subject as being to disclose dealings of which the parties cannot reasonably be expected to be aware ...."[40] For the Hunts and their attorneys, with their accumulated experience, to contend they were unaware of the matters relied upon to ground this charge of disqualification is not only unrealistic, but stultifying.

The Hunts' contention of disqualification of Allison with respect to Louisiana Power is that Louisiana Power:

> a Reid & Priest client, was involved in lengthy negotiations with one of the parties to the arbitration, Texaco, during the time that the arbitration Panel was considering the presentation of evidence in support of Hunt's case-in-chief. Indeed, at the time Hunt completed the presentation of its evidence in June 1982, Louisiana Power & Light was in the process of consummating a long-term natural gas contract with Texaco, which resulted in a proposed $1.7 billion payment by Texaco to the utility.[41]

One is moved to ask, in simple terms, so what? How can any fair minded, reasonable person conclude that Reid & Priest's representation of Louisiana Power in those negotiations (with which it is not claimed Allison played any part), which have no relationship to any issue in the arbitration, resulted in actual or evident partiality in favor of Texaco? The Hunts' claim is not only remote and speculative, but sheer nonsense, and its absurdity is manifested by the fact that the Hunts cite as their source of information an article in *The Wall Street Journal*, June 9, 1982,[42] and yet at the time of the publication made no claim such as is now advanced.

The next salvo by the Hunts is based upon Reid & Priest's representation of Mitsubishi Corporation and a number of its related companies. Mitsubishi is a highly diversified company which, among its many major activities, is engaged in the production of petroleum products and the explora-

---

**36.** Allison Aff., para. 2.

**37.** In view of the serious charges made by the Hunts against each arbitrator, the Court deemed it a matter of fairness that they respond thereto as part of the public record.

**38.** *Cf. Reed & Martin, Inc. v. Westinghouse Elec. Corp.,* 439 F.2d 1268, 1275 (2d Cir.1971).

**39.** 393 U.S. 145, 151, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968).

**40.** *Cook Indus., Inc. v. C. Itoh & Co. (America), Inc.,* 449 F.2d 106, 108 (2d Cir.1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972).

**41.** Plaintiffs' Memorandum, November 26, 1985 at 14.

**42.** Mook Aff., Ex. 36.

tion of oil. Mitsubishi operates on the international level. The Hunts assert they have learned that Mitsubishi, for more than a decade, has been involved with Shell, one of the Majors, in the exploration for oil off the coast of Japan; that Mitsubishi also has a joint venture with Kennecott Copper, which is 53% owned by British Petroleum, also a party to the arbitration, and that Mitsubishi is engaged in other business activities with British Petroleum, including a contract to purchase North Sea Oil. How Reid & Priest's representation of Mitsubishi companies in their dealings with Shell or any other Major, in matters unrelated to any issue in the arbitration, results in evident partiality or impacts upon Allison's capacity to sit in fair and honest judgment in the arbitration is not specified by the Hunts. No reasonable person would conclude that in consequence Allison was biased against the Hunts and partial to the other participants in the arbitration.

■ The Hunts continue their charges by reference to a consolidated antitrust suit by Zenith Radio Corporation against Mitsubishi and twenty other defendants.[43] The Hunts assert that after the arbitration was underway, they learned that Allison's firm, Reid & Priest, represented two Mitsubishi corporations in the Zenith action; that two other defendants, Sony Corporation of America and Sony Corporation, were represented by Randolph S. Sherman of Kaye, Scholer, Fierman, Hays & Handler, who appeared for Texaco in the arbitration. The Hunts' charge is that Allison failed to reveal that Sherman represented the Sonys when Reid & Priest represented the Mitsubishi companies in the Zenith action. This charge is devoid of substance; it is less than remote; it is frivolous. The Zenith litigation involved fifteen Japanese companies and a number of American companies who were charged by Zenith with price fixing and violation of the Anti-Dumping Act. That litigation had not the slightest relationship to any matter at issue in the

arbitration. There is no suggestion that the interests of Sony and Mitsubishi were allied in any respect except to the extent that they, as well as the other seventeen or eighteen defendants, denied Zenith's claims of antitrust violations. Unless the selection of arbitrators in an admittedly difficult and unusually complicated situation is to be confined to inexperienced, unknowledgeable and unworldly persons, who are unfamiliar with the complexities of the matters to be considered in a particular arbitration —those, in effect, who live in a vacuum from which knowledge of commercial and industrial life is excluded—there is no rational basis for the Hunts' claim. The fact that Sherman represented Sony and Reid & Priest represented Mitsubishi, separate defendants resisting Zenith's antitrust claims, while this arbitration was pending, would not lead a reasonable and fair minded person to conclude that there was evident partiality or that Allison was partial to any Major or any Independent to the arbitration and biased against or hostile to the Hunts. The claim is less than speculative. It is without reason.

The scenario continues, but the nature of the charges shifts. In their finecombing of financial news reports, financial year books, financial newspapers, periodicals, books, lawyers' guides, Martindale-Hubbell, and other legal directories, the Hunts concentrate on Allison's extracurricular activities to predicate a charge of evident partiality.

## II. Allison's Affiliation with the Southwestern Legal Foundation

Here the charge is based upon Allison's failure to reveal personal, social and professional ties to executives of various parties in the arbitration proceeding. Allison's panel card, which was distributed to all parties in advance of his appointment, listed among his professional memberships the "Southwestern Legal Foundation (adv.

---

**43.** *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 494 F.Supp. 1190 (E.D.Pa.1980); *In re Japanese Electronic Prod. Antitrust Litiga-* *tion,* 723 F.2d 238 (3d Cir.1983), *rev'd,* — U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

bd.)." [44] Since 1980 Allison has served as Vice Chairman of the Advisory Board of the International and Comparative Law Center, a section of the Southwestern Legal Foundation. The Center seeks, through education, to improve the role of law in both private and public relations; to foster better understanding of the role of law in international transactions, and to seek methods and means to make that role of law more effective. To accomplish its purpose, the Center conducts forums and seminars participated in by lawyers, law professors, scholars and leaders of various nations who share their knowledge, experience and interest with one another. The Advisory Board has almost 200 members, many of whom are partners in well known law firms, house counsel to national and international corporations, and law professors and public interest personalities. Also included among the membership of the Advisory Board are a number of executives or General Counsel of some of the parties to the arbitration, and partners in four firms who appear for the Majors in the arbitration. A Vice President and General Counsel of Caltex also serves as a Vice Chairman of the Advisory Board. It does not appear that any of the foregoing individuals appeared in, participated or played any role in the arbitration.

■ The Hunts state that in 1974 they had personal negotiations with Caltex General Counsel involving Hunts' entitlement to oil under the terms of the LPA. Thus, as nearly as this Court can make out, the charge is that since Allison and Caltex General Counsel each serve as a Vice Chairman of the Advisory Board of Southwestern Legal Foundation, this should have been disclosed to the Hunts and that the failure to do so constituted evident partiality. This is not only a nonsequitur, but is without substance. It is not alleged that Allison ever knew or heard of Hunts' negotiations with Caltex counsel in 1974, which was seven years before Allison's designation as arbitrator; nor is it alleged what

possible impact the Caltex-Hunt negotiation has on any issue in the arbitration proceeding, or how the fact that Allison and Caltex General Counsel serve as Vice-Chairmen of the Advisory Board bears on Allison's capacity to serve as an impartial arbitrator or creates evident partiality.

■ What remains then is the claim that Allison, by reason of his service as Vice Chairman of the Advisory Board, and his attendance at the seminars or forums, and at incidental social gatherings of those functions, necessarily met executives, general house counsel or members of law firms representing some of the parties in the arbitration, and that this should have been disclosed, failing which it resulted in evident partiality in favor of the Majors and the other participants in the arbitration. The claim borders on the frivolous and one can only wonder whether it is seriously advanced. If the contention has the slightest merit, it would mean that a lawyer who is active in bar association affairs, or serving as an officer or as a member of a committee of a professional organization, would create a conflict of interest as an arbitrator if he failed to disclose that concurrently an executive of a party or a lawyer of a firm representing one of the parties in the arbitration served in like or similar capacity, and that they met at and participated in panel discussions or social gatherings in connection with their activities in those professional groups. Such a situation, as already observed, "would make it impossible, in some circumstances, to find a qualified arbitrator at all." [45]

The Hunts' final accusation against Allison is based upon information he submitted to all interested parties while the arbitration was in progress. In September 1984 Allison informed the parties to the arbitration that Feddon J. Meyers, Michael W. Faber and Charles T. Duncan, members of a Washington law firm, ("Meyers, Faber and Duncan") were to become partners of

---

**44.** Mook Aff., Ex. 25.

**45.** *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79, 83 (2d Cir.1984).

Reid & Priest. The new partners were principally engaged in the practice of telecommunications law. Allison's letter further stated:

> The reason for this letter is that they [the Meyers, Faber and Duncan firm] have done a limited amount of legal work for Exxon Office Systems and Zilog Corporation, which I understand are subsidiaries of Exxon Corporation engaged in the business of information services. I am informed that their billings for this work have averaged less than $10,000 per year over the past several years. I am also informed that they would anticipate that, in the normal course of events, similar work would be done by them in the future.
>
> I have reviewed this situation and firmly believe that it will not affect my impartiality as an arbitrator in the LPA arbitration. Neither, in my view, does it create an appearance of partiality or bias. Nevertheless, I feel that it is appropriate to make the facts known to the American Arbitration Association and to ask that the Association inform the parties to the LPA arbitration of the contents of this letter.[46]

Hunts' counsel did not respond until one month later, October 12, 1984, when he wrote to the AAA and all counsel as follows:

> According to Mr. Allison, these attorneys have represented Exxon in the past and anticipate that they will represent the corporation in the future.
>
> Such a tie between the firm of which Mr. Allison is a senior partner and one of the parties to the arbitration not only creates an appearance of partiality or bias, but constitutes a clear conflict of interest. The conflict of interest created by the close association between Mr. Allison and Exxon is exacerbated by the fact that Exxon's general counsel is Chairman of the Board of the American Arbitration Association and the former general counsel to the AAA is now a partner at Reid & Priest.[47]

Thereafter, in response to a suggestion by the AAA, on October 22, 1984, Allison advised all parties that he had arranged with his firm that if it should undertake legal work in the future for Exxon Office Systems and/or Zilog Corporation, he personally would not be involved in that work and further that he was not to be informed of any confidential information imparted by those companies to his firm in the course of any such work. He also reiterated his statements made in his letter of September 10, 1984 concerning his continued impartiality as an arbitrator in the LPA arbitration.[48]

■ The Court disregards Hunts' statement that Meyers, Faber and Duncan represented Exxon, and not a subsidiary, as conclusory. The legal services rendered by them were of a minor nature and unrelated to any issue in the arbitration and their billings were of a minimal amount. The Court does not agree, nor would the average fair minded and reasonable person agree, that the matters relied upon by the Hunts created a conflict of interest which not only disqualified Allison, but required the substitution of another arbitrator and a de novo hearing or reconsideration of matters heard to the date of disqualification. To the contrary, viewed against the background of the issues before the arbitrators and the disclosure by Allison of matters with respect to Meyers, Faber and Duncan upon their joining the Reid & Priest firm, and Allison's relationship to their new client, no reasonable person would conclude that there was evident partiality or that he was partial to Exxon.

In sum, objective analysis of Hunts' various charges, viewed singly or collectively, compels the finding that no reasonable person would have to conclude that Allison

---

**46.** Mook Aff., Ex. 40, Allison Letter dated September 10, 1984.

**47.** Mook Aff., Ex. 42, Hirschkop Letter dated October 12, 1984.

**48.** Mook Aff., Ex. 43, Allison Letter dated October 22, 1984.

was biased against the Hunts or partial to the other independents and the Majors.

### III. The charge against Arbitrator Kenneth W. Dam

As already noted, at the time of his appointment as arbitrator, Dam was Professor of Law and Assistant Provost at the University of Chicago. He was nominated for the position of Deputy Secretary of State on July 19, 1982. Pending confirmation by the Senate, by consent of all parties, he continued to serve as a member of the Panel as to matters already concluded and ripe for disposition. Subsequent to Dam's nomination, but prior to his confirmation, the Panel rendered a ruling on September 5, 1982 after three days of hearing oral argument. Dam's resignation as arbitrator became effective September 22, 1982. He was sworn in the next day as Deputy Secretary of State.

The basis of Hunts' charge against Dam is that he became a full time consulting employee of the Department of State on or about July 19, 1982, and that he was such an employee at the time the Panel heard arguments and decided to dismiss a number of the Hunts' claims against the Majors and Occidental on September 5, 1982. The thrust of the charge is that Dam, during that period, had begun to assume many of the duties of the Deputy Secretary of State. The Hunts allege, "upon information and belief," that at the same time Dam had under consideration motions to dismiss the Hunts' claims, he was also deciding, in a high level government position, policies that were in furtherance of the interests of the major international oil companies who were parties to the arbitration and that this created a conflict of interest as to his duties as an arbitrator.[49]

▮▮▮ To support the foregoing charge the Hunts rely upon an article entitled "U.S. Seeks to Protect Oil Firms' Position in South China Sea Bids" that appeared in the *Washington Post* on November 14, 1982, eight weeks after Dam terminated his services as an arbitrator. Not a single fact matter supports this "information and belief" allegation. It is so barren of support that the charge falls of its own weight. The article states that the Reagan Administration has made a series of moves to protect the competitive position of the United States oil companies in the multi-billion dollar bidding battle to develop China's vast offshore oil reserves. It describes the efforts made by United States diplomats, intelligence and private industry to work together to protect United States commercial interests. It also reports that Deputy Secretary of State Kenneth W. Dam cabled the U.S. Embassy in Peking and Tokyo and Consulates in Shanghai, Canton and Hong Kong, and directed officials in those agencies to express United States concern at high levels about the possible implication of granting Japan's request for special consideration. On its face, the actions referred to have not the slightest bearing or relationship to any issue in the arbitration. Hunts' charges fail to establish any conflict of interest or disqualification of Dam. Nonetheless, Dam has challenged the Hunt allegations and fairness requires that his version be set forth.

Dam denies that prior to his confirmation and during the relevant period he began to carry on his functions as Deputy Secretary of State. He swears that the duties of that office were performed by the then incumbent Deputy Secretary of State, Walter Stoessel; that his, Dam's, activities were as a consultant preparing for his confirmation hearing and familiarizing himself with the issues, institutions and people he would be dealing with after his confirmation and swearing in.[50] Apart from his denial that he served as "Acting Secretary of State," he avers he did not, during the relevant period, deal with matters directly or indirectly affecting the parties; nor did he act, give advice, or attend any meetings on oil industry matters. He states that during that period he served as a consultant to the

---

**49.** Mook Aff., Ex. 75, Complaint filed in Superior Court of the District of Columbia, para. 37.

**50.** Dam Aff., para. 3.

Department of State and was paid for hours actually worked; that as to the cable bearing his name, whenever the Secretary of State is absent or away from Washington, hundreds of cables leaving the State Department daily during the Secretary's absence bore his name as signatory whether or not he saw them; and that, in fact, he saw only a small percentage of the cables bearing his name and was not aware of the particular cable referred to in the *Washington Post* article until it was brought to his attention.[51] Dam notes, as the Court has already observed, that the November 14, 1982 *Washington Post* article refers to events that occurred almost two months after his swearing in and ten weeks after the Panel made its decision.[52] The Court has referred to Dam's affidavit, but does not rely upon any of its allegations in the consideration of the Hunts' charge.

■ Even accepting Hunts' allegations that prior to his confirmation as Deputy Secretary of State Dam had begun to assume the duties of that office and took action, as asserted, on behalf of the Majors during the period he had under consideration the motions then pending in the arbitration, Dam's services in his official capacity had not the slightest bearing or relevance to any issue before the arbitration. The interests that concerned the State Department were those of the government of the United States in protecting the American economic interests in the important and vital oil industry. The actions and policies advanced were not singular to any particular company, but were to protect an entire American industry no matter which particular company was involved or benefitted. These protective governmental policies were no different in kind than the interest displayed by the State Department when it participated in and was advised of the discussions that resulted in the LPA. As previously noted, that agreement was designed to present a united industry front to

withstand increasingly aggressive actions by the Libyan Government.[53] The claim clearly is without merit.

■ A further and separate charge is made that Dam's undertaking the responsibilities of the Deputy Secretary of State at the same time he was serving as an arbitrator and employed as a university professor and provost created an appearance of impropriety as to his ability to give full and complete time and consideration to his arbitral duties. This charge requires little discussion. Clearly it was not intended by the parties to the arbitration or by the arbitrators themselves, that the arbitrators give up their regular professional duties and devote their entire time exclusively to arbitration. The record demonstrates to the contrary. Moreover, during the relevant period, Dam was on academic vacation. The University of Chicago is on a quarter system and autumn classes did not begin until September 30, 1982, after Dam no longer served as arbitrator. The Hunts' assertion that the matters referred to created a conflict of interest and an appearance of impropriety as to his ability to give complete consideration to his arbitral duties is as meritless as the charges with respect to his service as Deputy Secretary of State.

IV. The Charge of Disqualification against Arbitrator Richard J. Medalie

■ The scatter gun attack upon the arbitrators appears in the Hunts' charge against Medalie, set forth in a footnote, which suggests it is sheer afterthought and not advanced as a matter of substance, that he "... failed to disclose that two lawyers in his firm, Leonard A. Fink and John S. Greenbaum, represent several companies in the oil and coal production industries ... includ[ing] Alma Coal Corporation, Citation Coal Corporation, JOC Oil Company, and South Wind Coal Compa-

---

**51.** *Id.* at para. 5.

**52.** *Id.*

**53.** *See Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 200–202 (S.D.N.Y.1978), *aff'd without opinion,* 610 F.2d 806 (2d Cir.1979).

ny...." [54] Upon its face, this bare allegation does not have the slightest bearing or relationship to any of the parties or any issue in the arbitration. This charge is so devoid of substance that a mere reading of the footnote reference warrants rejection of the claim of evident partiality. Nonetheless, Medalie refers to it in his affidavit. Fink and Greenbaum are of counsel to his firm. Fink has office space with Medalie's firm, maintains his own practice, and from time to time Medalie, as well as other attorneys in his firm, have represented Fink's clients in litigation, but solely on an ad hoc basis. Greenbaum, who is not a Washington resident, maintains his main office in Louisville, Kentucky, where he is the principal partner of a firm; occasionally he makes use of the Medalie firm's office facilities. The Hunts' reference to the "several companies in the oil and production industries" is to clients of Greenbaum's firm. Medalie swears that until he heard that reference and the charges based thereon, he did not even know these companies' names, and that neither he nor any member of his firm ever had anything to do with any coal and oil production clients of the Greenbaum firm. As stated, in the light of the lack of substance of the footnote charge, it was not required for Medalie to respond, but it indicates the extreme lengths to which the Hunts go to attribute misconduct to the arbitrators.

The Hunts' footnote charge has a further allegation, to wit, that Medalie failed to "disclose that his law partner sat on the board of Penn Central Corporation ..., a holding company, whose subsidiaries read like a *Who's Who* in the energy industry

.... [that] Hunt became aware of this tie, not through Mr. Medalie but because Mr. Tom Hunt also is on the board of Penn Central." [55] Other than this bare statement, no factual matter is alleged. In the reorganization of the Penn Central, among the various claimants were American and European banking interests who were given the right to designate a member of the reorganized Penn Central Board.[56] The Medalie firm represented a number of those interests, and Medalie's partner was designated for the Board position. He served from May 1978 until May 1985, which included the arbitration period.[57] No factual matter has been presented which even remotely warrants an inference that Medalie's partner's service as a director on the Board of Penn Central created an actual or potential conflict of interest by Medalie, nor permits any inference that the situation had the slightest bearing on Medalie's capacity to serve as a fair and impartial arbitrator or that impugns the integrity of his fact finding.

An additional charge is made against Medalie (and Allison and Herwitz) which the Hunts urge requires vacatur of the award. This charge is based upon a telephone conversation that Medalie had with Dam, relating to the Hunts' third action instituted in the Superior Court of the District of Columbia in February 1983 against Dam, following which Dam had conversations with Allison, Herwitz and the AAA Tribunal Administrator. The Hunts say they learned of these conversations from Medalie's time charges in his billing statements to the AAA, and that Medalie "never revealed to the parties that he had

---

**54.** Plaintiffs' Memorandum, November 26, 1985 at 25 n. 22. "Following a pattern of concealment, arbitrator Medalie also failed to make full disclosure of potentially improper business relationships at the time of his confirmation as an arbitrator. Prior to being selected as an arbitrator, Richard J. Medalie submitted to the AAA his resume and a statement that he was unaware of any actual or potential conflicts of interest. *See* Letter, Richard J. Medalie to Barbara Lamot, October 20, 1980, Exhibit 58. Mr. Medalie, however, failed to disclose that two lawyers of counsel to his firm, Leonard A. Fink and John S. Greenebaum, represent several companies in

the oil and coal production industries. *See* Martindale-Hubbell Law Directory (1982) at 1358B–1359B, 249B–2495B, Exhibit 59. Companies represented by counsel to Mr. Medalie's firm include Alma Coal Corporation, Citation Coal Corporation, JOC Oil Company, and South Wind Coal Company. *Id.*"

**55.** *Id.*

**56.** Medalie Aff., para. 10.

**57.** *Id.*

spoken with former arbitrator Dam concerning matters raised in Hunt's lawsuit, nor has he ever revealed the contents or nature of his discussion;"[58] they argue that Medalie's conversation with Dam was improper and prejudicial to them. The action against Dam in the District of Columbia in some respects paralleled the Hunt allegations in the New York State Supreme Court action, which made similar charges against Medalie and Allison. The Hunts' contention of disqualification suggests that when the Hunts instituted their District of Columbia lawsuit against Dam, which renewed their charges in the earlier New York State action, that the lips of the existing panel of arbitrators, Medalie, Allison and Herwitz, should have been sealed; that if they did speak on the subject they were under an obligation to inform the Hunts and the other parties of their discussions. Thus the Hunts charge that the failure to disclose the substance of those discussions was prejudicial to them and reflected bias or evident partiality. The charge is rejected. No matter what the content of the conversations as to which the Hunts speculate, there is no rational basis presented upon which a reasonable person would consider that the discussions constituted actual or evident partiality.

## V. Alleged Misconduct by the Arbitrators and the AAA. (10 U.S.C. §§ 10(b), 10(c))

These charges center about an assortment of claims with respect to fees and expenses of the arbitrators characterized by the Hunts as "corrupt and unethical behavior." The AAA is accused of having aided and abetted such conduct. While not clearly articulated, the claim appears to be that such conduct establishes "evident partiality or corruption,"[59] or "misbehavior by which the rights of [a] party have been prejudiced."[60]

After the initial panel of arbitrators was selected in May 1981, the parties signed a compensation stipulation which provided that each arbitrator be compensated at the rate of $1500 per day of hearing, and that time spent in study, conferences and necessary travel would be compensated at the rate of $225 per hour. The stipulation further provided that in the event the arbitration became protracted, the rates were to be subject to periodic review. The parties were to advance the cost of such compensation to the AAA subject to final apportionment in the award. Each party was to make deposits promptly, in advance, with the AAA as it deemed necessary to defray the expense of the arbitration, including arbitrators' fees, pursuant to section 51 of the AAA's rules.[61] The Administrator was to make payments to the arbitrators, in conformity with the agreement, from the funds so deposited; and finally, the stipulation specified that the arbitrators shall include in their award a provision allocating all fees and expenses, including arbitrators' compensation incurred in the conduct of the arbitration.

First, the Hunts charge that the fees agreed upon to be paid to the arbitrators were excessive in the light of the normal rates paid to the arbitrators. The short answer is that this was a consenual arrangement entered into by sophisticated business interests, represented by highly experienced lawyers, and there was no compulsion that required the Hunts or any other party to the arbitration to agree to the compensation stipulation.[62] Moreover, given the complexity of the issues in the

---

**58.** Plaintiffs' Memorandum, November 26, 1985 at 37.

**59.** 9 U.S.C. § 10(b).

**60.** 9 U.S.C. § 10(c).

**61.** Commercial Arbitration Rules § 51 (American Arbitration Association 1977). The Rule provides in relevant part that: "The AAA may require the parties to deposit in advance such sums of money as it deems necessary to defray the expense of the arbitration, including the Arbitrator's fee, if any...."

A copy of the Compensation Stipulation, dated May 21, 1981, can be found in the Mook Affidavit, Exhibit 60.

**62.** Hispanoil and Conoco did not sign the Compensation Stipulation.

arbitration, the involved claims, crossclaims and counterclaims, the number of parties asserting them and their respective and conflicting contentions and interests, it required, as previously noted, that the arbitrators have a background of unusual experience, ability and sophistication.

■■■ Sometime after the hearings started and it appeared likely they would become protracted, the Hunts sought to have the AAA renegotiate the fees downward. While some of the participants agreed with the Hunts, others did not; the latter considered the stipulated compensation fair in view of the complexity of the matters at issue. No consensus was reached to modify the fee schedule. The hearings continued with the fees as stipulated in the Compensation Stipulation. Curiously, although the Hunts requested the AAA to renegotiate a reduction of fees, among its other claims on the fees subject they charge that "the AAA prejudiced Hunt's position by contacting the arbitrators concerning such a modification."[63] The claim of excessive fees is also directed against the AAA, which is charged with overbilling for administrative costs of the arbitration proceeding. Even assuming this Court has the power to vary the parties' agreement for compensation, the fees specified cannot be said to be excessive—certainly not considering that the average rate per hour charged by a senior partner of an established law firm in major metropolitan areas of the country is at the rate of $200–$250 per hour, or $1600–$2000 per eight hour day.[64] In any event, the compensation agreement itself furnishes no ground to vacate the award.

Next, the Hunts make involved allegations of misconduct against the arbitrators and the AAA with respect to fees payable to the arbitrators and advance deposits necessary to defray the expense of the arbitration. As the arbitration moved forward, payment of the fees billed by the arbitrators and submitted to the AAA, and advances required by the AAA for administrative expenses, were substantially in arrears. This situation existed both before and after the first phase of the proceedings and when the original panel made its ruling on September 5, 1982.

The Hunts and the other parties sought to have the AAA submit specified and detailed breakdowns of all billings, and a statement of payments received by the AAA from parties with a detailed accounting reflecting how those funds were applied by the AAA.[65] The AAA responded, but not in the detail requested by Hunt and some of the other participants. With respect to the allocation of administrative costs, the AAA advised the parties that since the Compensation Stipulation did not provide how such costs were to be allocated, it had determined to bill each party equally for the required deposits and that before scheduling further hearings the AAA, "as authorized by the Rules, is requiring that payment of all outstanding invoices be made promptly."[66] Among other charges, this action by the AAA is attributed to the arbitrators as improper conduct to coerce payment of the fees and expenses.

The nature of the controversy may be gleaned from correspondence exchanged between Hunt and the Majors. The Hunts, in July 1983, communicated directly with the arbitrators concerning issues relating to compensation and billing because they asserted they received no satisfactory response from the AAA. Clearly this was improper because, as their own counsel recognized, "the rules preclude the parties from negotiating directly with the arbitrators regarding their fees...."[67] The

**63.** Plaintiffs' Memorandum, November 26, 1985 at 39.

**64.** *See generally* The National Law Journal, Directory of the Legal Profession (1984).

**65.** Mook Aff., Ex. 88, Draft of Parties' Letter to George H. Friedman dated July 1, 1982.

**66.** Mook Aff., Ex. 91, Crean Letter dated March 9, 1983.

**67.** Mook Aff., Ex. 102, Hirschkop Letter dated July 27, 1983.

Hunts then took the position that the arbitration could not continue unless the issues they raised with respect to fees and advances were resolved and an accounting made by the AAA. The Majors protested, arguing that the Hunts' recent actions "strongly evidence an unfortunate decision to pursue a campaign of harrassment and disruption palpably designed to bring the proceedings to a grinding halt and, if at all possible, to torpedo them completely," [68] and that "no beneficial purpose [would be served] in any extended dialogue now concerning Hunt's various communications. All concerned should instead address themselves to the completion of the arbitration at the earliest possible moment, after which Mr. Hunt will have the opportunity if he so chooses to raise any and all objections he may have." [69]

The progress of the arbitration was threatened by this controversy, and at one point outstanding payments into the fund by some of the participants were more than a year behind. Attempts were made by the AAA to obtain the allocated fees from all the participants. With matters at a standstill, the arbitrators discussed the situation with AAA officials, but not with the parties, as to what steps could be taken to resolve the problem so that the arbitration could proceed. Some of the Majors agreed to and did make overpayments to the AAA to fund the fees and expenses of the arbitration (subject to reimbursement in the final award) and the hearings were resumed. At one point, during a stalemated period, a representative of the AAA disclosed to Medalie, designated as chief arbitrator, that the Independents were not paying or were not current with their payments.[70] The Hunts contend that they were included in the term "Independents," with the result that the arbitrators had a personal bias against them and thereafter consistently ruled adversely with respect to their claims. The Majors and Occidental contend, and the record gives some support to their position, that references during the proceedings to "Independents" were understood by all the parties to refer to independents other than Hunt and Occidental.[71]

Whatever the fact, the core of the Hunts' charge is that the knowledge received by Medalie, that the Independents, including Hunt, were not current with their payments, directly influenced the arbitrators' judgment and that they made rulings against them in retaliation. However variously stated and repeated, the ultimate charge is that such knowledge was the reason that the original Panel ruled against the Hunts in the September 1982 decision, and for the same reason, the reconstituted Panel excluded proferred evidence and rendered its final award in September 1985. This is a serious charge of personal corrupt conduct against each arbitrator. A study of this voluminous record, which on this subject includes many self-serving and perjorative statements by the Hunts' counsel, requires a finding that the charge is not only meritless but vicious. Upon the totality of facts, no reasonable person would conclude, as the Hunts charge, that the arbitrators in the various determinations acted adversely and with bias against the Hunts or to any other participant who may have been in arrears in payment into the fund. The contention that Medalie aggressively sought to ascertain which parties were delinquent in paying their assessments as billed by the AAA is not supported by the record. The inquiries were intended to see what could be done to get the arbitration moving on an orderly and expedited basis. The fact is that the Hunts themselves, who were obligated to pay

68. Ferraro Aff., Ex. 11, Hupper Letter dated August 9, 1983.

69. *Id.*

70. Lamot Aff., para. 4.

71. As agreed upon by the parties in setting up the arbitration proceedings, the parties were divided into groups—Phase I parties, consisting of the Majors, the Hunts and Occidental; and Phase II parties, consisting of the Independents, other than the Hunts, whose claims were held in abeyance during Phase I. *Cf.* Plaintiffs' Memorandum, November 26, 1985, at 33. *See also* Medalie Aff., para. 30.

1/14th of the charges at various times, publicized they were not making payments, and particularly so when they instituted their first State action.

On a charge of corrupt conduct against a judicial officer, while it is not material that his rulings were correct,[72] it is not without interest to note that the charge of retaliation and adverse rulings allegedly rendered against the Hunts because of nonpayment of fees finds a ready challenge by the number of rulings in their favor. Not all of Hunts' claims were dismissed in the September 1982 award made while Dam was a member of the Panel. In fact, eight out of the sixteen motions to dismiss the Hunts' claims were denied.[73] Moreover, the Hunts prevailed on a number of their claims against Gulf, Texaco and Occidental when the then newly constituted Panel made subsequent determinations. In a determination dated November 1, 1983, the Panel spelled out in detail the basis of its rulings. Indeed, on the issue of the Hunts' so-called secret offer, the arbitrators ruled against the Majors' counterclaims, which had it been otherwise would have cast the Hunts in millions of dollars of damages to the Majors and others. The arbitrators sustained the Hunts' claims: (1) to their 1971 Persian Production and most of their 1971, 1972, and 1973 pre-existing customer commitments; (2) for Libyan oil against Occidental's defense of waiver; (3) against Gulf's defense of waiver; (4) for dismissal of fraudulent concealment counterclaims asserted against the Hunts by British Petroleum, Exxon, Socal and Texaco; and (5) for dismissal of the paragraph 9 counterclaims of BP, Exxon, Occidental, Socal and Texaco with respect to Count II and Count III of Hunts' amended complaint.[74] Subsequent to this determination, the Panel awarded the Hunts $1,125,578 (not including Exxon's obligation which was netted against its overdelivery to Hunt) for undelivered Libyan crude oil,[75] and $116,000 for undelivered Persian Gulf crude oil,[76] in addition to a previous award of $477,838 against Gulf. The interest awarded to the Hunts on these favorable rulings, as of May 30, 1985, totalled more than $1,300,000.[77] The record compels the conclusion that each arbitrator made a fair and impartial determination based solely upon the record as developed during the course of the arbitration proceeding.

■ The Hunts next contend that there were numerous billing irregularities and overcharges by the arbitrators which the AAA failed to oversee or reject and that the AAA itself overbilled for its expenses without giving a detailed breakdown. Some of those claims are trivial, such as whether the arbitrators improperly charged for valet and laundry services, for the meals of a spouse, for first-class instead of coach airplane travel, and the rates charged at hotels. It appears from the hotel charges that one or more arbitrators stayed at first-class hotels when they travelled from their homebase to a distant city where hearings were conducted. However, if the Hunts or any other party were of the mind that particular expenses were not chargeable or were to be limited on a per diem basis, this should have been provided for in the compensation agreement. Absent an agreement on this subject, there is no basis for the auditing, eliminating, or reduction of such charges by the Court; certainly it affords no basis for vacating the award. The fact is that fees and administrative expenses were charged equally to all the parties and not to the Hunts

---

**72.** *United States v. Manton,* 107 F.2d 834, 845 (2d Cir.1939).

**73.** Ferraro Aff., Ex. 16, Panel Determination (September 5, 1982).

**74.** Ferraro Aff., Ex. 18, Panel Determination (November 1, 1983) (the ruling as to Occidental on its Count III counterclaim was reversed in a subsequent reconsideration. *See* Ferraro Aff.,

Ex. 19, Panel Determination (December 27, 1983)).

**75.** Ferraro Aff., Ex. 25, Panel Determination (March 6, 1985) (Libyan Oil Entitlements).

**76.** Ferraro Aff., Ex. 25, Panel Determination (March 6, 1985) (Persian Gulf Oil Damages).

**77.** Ferraro Aff., Ex. 28, Panel Determination (May 30, 1985).

alone. The Majors and Occidental do not question these charges.

As to the claim that the arbitrators charged $225 per hour, as provided for by the agreement, for study, conference and travel, in addition to the per diem rate for the hearings, the agreement does not foreclose such charges. Those services, and the time charges therefor, were independent of the hearing services and were for hours before and after the hearing proper.

■ The Hunts contend that the AAA overbilled for administrative expenses. The AAA was not a party to the arbitration agreement. This Court questions its jurisdiction or power to modify the AAA charges even assuming they are excessive (which the AAA denies). Equally without substance is the claim that the AAA permitted the arbitrators to overcharge in their billings. The charges and rates were authorized by the parties. Whether or not there is merit to the Hunts' claim, it affords no basis for a vacatur of the arbitrators' award.

## VI. Alleged Misconduct of the Arbitrators With Respect to Procedural and Evidentiary Matters

This charge is grounded on Section 10(c) of the Act, which provides that an award may be vacated for "misconduct" of the arbitrators "in refusing to hear evidence pertinent and material to the controversy" or for "any other behavior by which the rights of any party have been prejudiced." [78] The charges are fourfold, involving: (1) the phasing procedure adopted by the Panel whereby the Hunts were required to present their proof against the Majors and Occidental before the latter were required to present proof in support of their claims against the Hunts (Phase 1); (2) the Panel's refusal to consider documentary and affidavit evidence; (3) denial of

the Hunts' request for production of documents; and (4) the Panel's alleged change in midstream, without notice, of the procedural rules as to the burden of proof. The Hunts contend that all these factors deprived them of the opportunity to present a full and fair case for consideration by the arbitrators, and constituted "misconduct" under Section 10(c).

■ As to the order of proof, the arbitrators, after hearing the parties on the subject, decided to consider first the Hunts' claims against the Majors and Occidental and then their respective claims against the Hunts (Phase I). The order of proof clearly was within their discretion.[79] Moreover, it appears that the Hunts not only acquiesced in the procedure, but at one point thought it was a "good idea." [80] Further, and more importantly, there is no showing that the Hunts were prevented, by reason of the phasing, from offering any probative and relevant evidence, oral or documentary, in support of their claims or in opposition to claims asserted against them.

■ Next, the Hunts contend the arbitrators refused to consider documentary evidence to support their claim that the Majors' and Occidental's failure to deliver Libyan oil to the Hunts under the terms of the LPA forced the Hunts to stop nominating for such oil in mid 1974 and eventually drove them out of the international oil business. The Panel excluded the documents because they recorded internal company discussions that were made during the course of settlement negotiations.[81] The ruling was in accordance with the Federal Rules of Evidence § 408. The Hunts' claim that the documents were offered for purposes other than to prove liability does not establish their admissibility. The ruling by the Panel was not erroneous. Since other evidence on the subject through live wit-

---

78. 9 U.S.C. § 10(c).

79. *United States v. Manton,* 107 F.2d 834, 844 (2d Cir.1939); *see also Wyper v. Providence Washington Ins. Co.,* 533 F.2d 57, 60 n. 4 (2d Cir.1976); *Begley v. Ford Motor Co.,* 476 F.2d 1276, 1279 n. 5 (2d Cir.1973).

80. Ferraro Aff., Ex. 30, Tr. May 22, 1985 at 16.

81. Mook Aff., Ex. 134, Tr. March 23, 1982 at 5799.

nesses, including the Hunts and persons under their control, were available to testify, there is no basis for any claim that the exclusion of the documents prejudiced them in any material matter within the meaning of Section 10(c).

■■■ Third: the Hunts contend that three affidavits submitted in support of matters which they regarded as crucial were not given the consideration they deserved by the arbitrators. Upon consideration and evaluation of the affidavits, the arbitrators decided they were conclusory, contained matters of opinion, and therefore not probative or entitled to little weight. This clearly was within the arbitrators' function as fact finders. This determination was not only in accordance with law, but specifically within Rule 31 of the AAA's Commercial Arbitration Rules which in pertinent part provides:

> The Arbitrator shall receive and consider the evidence of witnesses by affidavit, but shall give it only such weight as he deems it entitled to after consideration of any objections made to its admission.[82]

The charge that the arbitrators failed to give the evidence the "consideration" it deserved is an attempt to probe the collective minds of the arbitrators as to how they reached their judgment. This claim, as the prior claims, is without merit.

■■■ While the Court has found that the foregoing claims are without substance, it should be noted that even had there been erroneous rulings, these would not automatically bring into play that portion of 9 U.S.C. § 10(c) dealing with "misconduct [by the arbitrators] in refusing to hear evidence pertinent and material to the controversy." Only the most egregious error which resulted in adversely affecting the rights of a party would justify the application of the rule and require vacatur of an award.

The statute cannot be read ... to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award.

. . . .

[E]ven the erroneous exclusion of such evidence by a court would not be reversible error on appeal if it was not of substantial harm to the party. In an arbitration case a court cannot act as a legal screen to comb the record for technical errors in the receipt or rejection of evidence by arbitrators who in most cases are layman.[83]

The Hunts further contend that the Panel denied their request for production of documents deemed by them relevant and material, failing which they were required to present a truncated case-in-chief without the benefit of being able to establish through documentary evidence the course of conduct followed by other parties with regard to crucial matters. To cast this contention in proper perspective, it must be considered against the factual background. This Court, in the Hunts' antitrust lawsuit, noted: "The case came to trial after extensive pretrial discovery, which included oral depositions of parties and witnesses taken here and in various foreign countries, answers to interrogatories, document production and answers to requests for admissions. The discovery process resulted in a pretrial record of thousands upon thousands of pages of testimony and documents." [84] The Hunts' application to the arbitrators for production was a broad Federal Rule of Civil Procedure, Rule 34 request. This type of request, which demanded "all documents" of various types, is not uncommon in litigation, and it is frequently abused. It is precisely the type of production demand that is the exception rather than the rule in arbitration. If per-

---

82. Commercial Arbitration Rules § 31 (American Arbitration Association 1977).

83. *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir.), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968).

84. *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 199 (S.D.N.Y.1978), *aff'd without opinion,* 610 F.2d 806 (2d Cir.1979).

mitted, it would defeat the very purpose of arbitration. As observed by the Fourth Circuit:

> An arbitration hearing is not a court of law. When contracting parties stipulate that disputes will be submitted to arbitration, they relinquish the right to certain procedural niceties which are normally associated with a formal trial. One of these accoutrements is the right to pretrial discovery.[85]

Apart from the exhaustive pretrial depositions and documents produced in the antitrust suit, which made available to the Hunts the essential evidence to support their claims and resist those of the Majors and other adversaries, the Hunts also had the benefit of document production by the Majors and Occidental that the Panel *did* allow. While it is true that not all of the Hunts' requests were granted, the record leaves no room to doubt that the Hunts' successive and broadening demand for document production received the Panel's careful consideration. At a hearing on Hunts' application for a subpoena duces tecum, seeking broad discovery, the Chairman of the Panel emphasized the requirement of a showing of materiality and relevancy needed to justify the issuance of a subpoena.[86] After submission of briefs and oral argument, the Panel, finding that the Hunts had failed to carry their burden, denied most of their application for a subpoena, stating:

> 2. With respect to the documents requested in paragraphs 2 and 3 of the application—[the application is denied] because Hunt has not shown with sufficient particularity the need for such documents at this state of the proceedings and *because the request as drafted is so broad that it is tantamount to a request for discovery,* the Panel hereby denies the application with respect to the documents specified in paragraphs 2 and 3, without prejudice, however, to Hunt to present a narrower request for documents at such time as the relevance and materiality of such documents can be established. (Emphasis added).[87]

■ With the massive evidence derived in the antitrust suit,[88] and the additional documentary proof obtained as a result of Panel rulings, there is no rational basis for the Hunts' claim that the arbitrators were guilty of misconduct in refusing to issue a broadside subpoena "tantamount to a request for discovery." [89] "[F]undamental fairness does not require that an arbitrator must hear any and all evidence a party may wish to offer, regardless of its length, repetiveness or irrelevance." [90]

The Hunts have not shown in the slightest degree that the failure to obtain additional discovery prevented them from presenting material evidence with respect to any issue before the arbitrators. These claims of "misconduct" are without substance.

The Hunts' final procedural complaint is the arbitrators' refusal to abide by their own rulings. The essence of this charge is that during the presentation of their case-in-chief the arbitrators and the parties were of the view that to prevail the Hunts need only establish a prima facie case in support of their claim, but later, without prior notice to the Hunts, when the arbitrators heard the motions of the Majors and Occidental to dismiss the Hunts' claims, the Panel determined that the prima facie standard was not sufficient and applied the "fair preponderance of the evidence" test.

---

**85.** *Burton v. Bush,* 614 F.2d 389, 390 (4th Cir. 1980) (citations omitted).

**86.** Ferraro Aff., Ex. 30, Tr. March 10, 1982 at 5289–90, 5304–05.

**87.** Panel Determination, April 7, 1982.

**88.** *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 199 (S.D.N.Y.1978), *aff'd without opinion,* 610 F.2d 806 (2d Cir.1979).

**89.** *See generally* Mook Aff., Ex. 30, Tr. May 22, 1981 at 35–36; Tr. August 26, 1981 at 190–91.

**90.** *National Post Office Mailhandlers, etc. v. United States Postal Service,* 751 F.2d 834, 841 (6th Cir.1985).

Accordingly, they urge that this was an improper allocation of the burden of proof by the Panel which deprived them of the opportunity to offer evidence to meet the fair preponderance of the evidence standard. The Hunts also allege they were further misled because the arbitrators originally stated that entitlement to oil would be decided on a pool basis, but when the motions to dismiss were heard the Panel abruptly changed its position and ruled that the Hunts were required to establish their claims against each party on an individual basis. Based upon the foregoing allegations, the Hunts assert they were deprived of the opportunity fully and fairly to present their case-in-chief against the respondents and that this constituted misconduct under Section 10(c), which requires vacatur of the award.

■■■ A reading of the record requires rejection of both claims. As to the burden of proof contention, the Chairman, when the motion to dismiss was argued, noted that in a prior discussion the Panel was "wondering out loud and merely articulating some of our rambling thoughts concerning the LPA."[91] And it is not without significance that the Hunts' counsel, prior to the hearing of the motions to dismiss the Hunts' claims, stated that the standard to be applied was " 'the preponderance of evidence' standard.... [The Majors] cannot hope that the arbitraion will invent a more diluted standard."[92] Additionally, in November 1981, some ten months before the arbitrators heard the motions to dismiss the Hunts' claims, counsel for Occidental indicated that respondents, at the end of the Hunts' case, would move similar to Rule 41(b) of the Federal Rules of Civil Procedure for dismissal. This was a clear indication that the Hunts' burden was to prove their case by a fair preponderance of

the evidence.[93] Moreover, no final determinations were made in the September 1982 rulings. The Panel emphasized that its decisions were open to reconsideration, and, in fact, the Hunts did move for reconsiderations, which were fully considered by the Panel, including submission of additional evidence. Thus, even if the Hunts had misunderstood the applicable burden of proof, the claimed prejudice of this misunderstanding to the presentation of their case and a final decision by the Panel is without substance and, at the most, de minimis.

■■■ As to the pool or individual entitlement issue, the Hunts' breach of contract claim specifically charged each Major and Occidental with individual breaches of obligation under LPA. Hunts' counsel had previously recognized their obligation to prove the breach of contract claim against individual companies.[94] Moreover, the contention does not wash since the statement attributed to a Panel member which allegedly misled the Hunts was made after all of the evidence in their case-in-chief had been presented and just prior to when they rested their case.[95]

The foregoing claims, whether considered singly or in combination, do not establish "misconduct" under Section 10(c).

## VII. The Arbitrators Exceeded Their Power in Awarding Attorneys' Fees to the Majors and Occidental

Section 10(d) of the Act provides for the vacatur of an award "where the arbitrators exceeded their powers." The LPA contained a covenant not to sue and a provision that any controversy or claim arising "out of or relating to this contract or the breach thereof shall be settled by arbitra-

---

**91.** Mook Aff., Ex. 169, Tr. September 1, 1982 at 7365.

**92.** Plaintiffs' Prehearing Reply Brief, August 10, 1981 at 34–35.

**93.** *Cf. Motorola, Inc. v. Fairchild Camera & Instrument Corp.*, 366 F.Supp. 1173, 1175–76 (D.Ariz.1973).

**94.** Ferraro Aff., Ex. 30, Tr. November 20, 1981 at 2939.

**95.** Between the June 9, 1982 hearing when the statement was made until the next hearing on June 29, 1982, when the Hunts rested their case-in-chief, the Hunts submitted no new evidence.

tion." The arbitrators ruled that in bringing Count I of their antitrust case against all the parties to the agreement, the Hunts had breached the covenant not to sue. Similarly, they ruled that by asserting Count III (the Act of State count) against Occidental, the Hunts had breached that covenant. The Panel awarded the defendants $3.5 million, representing a portion of attorneys' fees in defending those antitrust claims. While the Hunts refer to this award as "incredible," the Court has already noted that the antitrust trial extended over eight weeks, preceded by extensive pretrial discovery here and abroad, many pretrial motions and a number of interlocutory appeals. Each defendant was represented by separate counsel. The Hunts claimed over two hundred million dollars in actual damages and, in addition, requested treble damages.[96] Under these circumstances, the fees awarded to each litigant cannot fairly be characterized as "incredible." Indeed, the breakdown of the award reflects that all matters considered, they were indeed modest.

| Respondent | Amount of Damages |
| --- | --- |
| BP | $175,000 |
| Chevron | 410,000 |
| Exxon | 525,000 |
| Gulf | 100,000 |
| Mobil | 300,000 |
| Shell | 375,000 |
| Texaco | 210,000 |
| Occidental | 200,000[97] |

However, this does not resolve the Hunts' basic charge that the arbitrators exceeded their powers, which we now address.

The Hunts contend, and correctly so, that this Court held that their antitrust claims were not for determination by the arbitrators. The award of fees was made only

with respect to Counts I and III of the Hunts' amended complaint; no award was made as to their claims under Count II. The Hunts contend that the arbitrators' consideration and disposition of the covenant not to sue was inappropriate; that the Panel made "legal determinations concerning complex matters of law," and engaged in "retrying the antitrust case itself" and wandered into "the thicket of complex antitrust issues." The Hunts argue that this contravened the public policy which prohibits arbitral judgment on antitrust claims, and thus the arbitrators exceeded their powers in violation of 9 U.S.C. § 10(d). However, this contention misconceives what the Panel considered and decided. All the defendants in the antitrust suit, in addition to denials of the Hunts' claims, among other defenses, alleged as a separate defense that the assertion of the antitrust claims violated the covenant not to sue. This Court granted the Hunts' motion, and that of various defendants, "to stay all proceedings with respect to the breach of contract claim pending arbitration pursuant to the arbitration provision in the Agreement" until the final determination of the antitrust claims.[98]

■ The Hunts' contention that the determination of whether an issue was arbitrable is for the court and not for the arbitrators to decide disregards the fact that the claims of breach of contract were submitted for determination by the arbitrators pursuant to the parties' agreement, compliance of which was directed by the Court in its final judgment. Indeed, the final judgment in vacating the stay of the arbitration specifically directed that the arbitration proceed with respect to plaintiffs' breach of contract claim, the defendants' defenses thereto, and their counterclaims which had not been resolved in the antitrust suit.[99] Thus it was within the author-

**96.** Mook Aff., Ex. 171, Plaintiffs' Amended Complaint at 27-8.

**97.** Mook Aff., Ex. 147, Panel Determination (November 27, 1984).

**98.** *Hunt v. Mobil Oil Corp.,* 410 F.Supp. 10, 25 (S.D.N.Y.1976), *aff'd,* 550 F.2d 68 (2d Cir.), *cert.*

*denied,* 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

**99.** *Quoted in Hunt v. Mobil Oil,* 557 F.Supp. 368, 371 (S.D.N.Y.1983), *aff'd,* 742 F.2d 1438 (2d Cir. 1984).

ity of the arbitrators to consider and decide whether the filing of the antitrust suit violated the covenant not to sue, and if so, the amount of damages, including costs and attorneys' fees incurred as a result. The arbitrators were not called upon to, nor did they, determine antitrust issues.

The Panel, which included a law professor and two experienced lawyers, was fully sensitive to public policy considerations that mandate that antitrust violations are inappropriate for arbitration as enunciated in *American Safety Equipment Corp. v. J.P. Maguire & Co.*[100] but that an agreement to arbitrate existing or past antitrust claims does not contravene public policy concerns.[101]

The arbitrators found that: (1) the covenant not to sue was renewed and incorporated in the LPA supplement; (2) the Hunts' antitrust claims that arose *prior* to the execution of the LPA supplement were *past* antitrust claims which *were subject to the covenant* not to sue and gave rise to liability under the covenant for damages, including attorneys' fees, in defending against those claims; and (3) that the Hunts' antitrust claims that arose *after* November 21, 1972, the execution date of the LPA supplement, were *future* antitrust claims and hence not *subject to the covenant* not to sue by virtue of the "public policy exception."[102] The arbitrators' determination was within the scope of their authority and it did not exceed their powers in violation of Section 10(d).

The Hunts further contend that this Court's disallowance of the defendants' proposed judgment, which included a provision for costs in defending against the Hunts' claim, was preclusive. This contention is without substance. The denial of the request in the antitrust suit was based upon the fact that none of the parties prevailed upon its respective claims and counterclaims; it had no bearing on the issue reserved for determination by the arbitrators under the breach of the covenant not to sue.

## VIII. The Claim that the Arbitrators Failed to Render a Final and Definite Award

The arbitrators' final award states that "This Award is in full settlement of all claims and counterclaims submitted on this arbitration."[103] Nonetheless, the Hunts contend that the Panel failed to render a final and definite award and hence that it is unenforceable under Section 10(d) of the Act, which provides that an award may be set aside "Where the arbitrators ... so imperfectly executed [their powers] that a mutual, final and definite award upon the subject matter submitted was not made." This attack upon the award is directed to fees and costs awarded rather than to the determination of the claims and counterclaims. The contention is that the Panel failed to specify the dollar amount of compensation fees and costs to be paid by each party and to whom they were to be paid.

The Hunts and Marathon had requested an audit of all arbitration costs and deposits. The Panel declined the request because the matter was more appropriate for resolution by the AAA pursuant to its Rule 51.[104] Accordingly, the Panel decided not

---

**100.** 391 F.2d 821, 826–28 (2d Cir.1968).

**101.** *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 891–92 (3d Cir.1975); *Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1214–15 (2d Cir.), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972); *Power Replacements, Inc. v. Air Preheater Co.,* 426 F.2d 980, 983–84 (9th Cir.1970); *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 827 (2d Cir.1968). *Cf. Richards' Lumber & Supply Co. v. United States Gypsum,* 545 F.2d 18 (7th Cir.1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977).

**102.** Mook Aff., Ex. 172, Panel Determination (December 27, 1983).

**103.** Whitaker Aff., Ex. 3, Award of Arbitrators (September 30, 1985).

**104.** Commercial Arbitration Rules § 51 (American Arbitration Association 1977). Section 51 provides in relevant part that "The AAA may require the parties to deposit in advance such sums of money as it deems necessary to defray the expense of the arbitration, including the Arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpected balance."

to ascertain the precise dollar amounts of the arbitrators' fees, the AAA's administrative costs and expenses, the excess of advance deposits made by some of the Majors or to calculate the precise dollar amount of the allocable shares of the costs to be assessed against the various parties. The basic data was in the possession of the Administrator, the AAA, which had the administrative responsibility for such matters. The Panel stated that its award would include "an allocation formula and certain principles for determining the various dollar amounts due" and to whom and by whom they were payable.

The allocation formula issued by the arbitrators, dated September 30, 1985,[105] first stated that the total costs of the arbitration to be allocated among the parties consisted of compensation and expenses of the arbitrators, reimbursable expenses incurred by the AAA and all AAA fees. Next, for the purpose of allocating the foregoing total costs, the arbitration proceeding was divided into three parts:

(a) Part One: From the beginning of the process of selecting the arbitrators, as of approximately July 1, 1979 to the start of Phase I, that is, on November 1, 1981;

(b) Part Two: From November 1, 1981 until March 8, 1984, the date of the settlements among the non-Phase I Independents and the Phase I respondents; and

(c) Part Three: From March 9, 1984 to the end of the arbitration (September 1985).[106]

The formula then specified how to determine the amount of the various costs for each time period and how the compensation and expenses of the arbitrators' and the AAA's reimbursable expenses were to be attributed to the respective time periods. It further provided for computations with respect to all parties within the specified

time periods, which is discussed in greater detail in considering the objections of the Conoco group to the assessments against them.

■ The formula and principles specified by the Panel for allocating fees and costs was definitive, clear and precise. It complied with the Compensation Stipulation which provided "The Arbitrators shall include in their Award a provision allocating all fees and expenses, including Arbitrators compensation, incurred in the conduct of the arbitration." [107] The formula did just that. It was capable of easy application by the AAA. Reliance upon the AAA to apply the formula and principles specified in the award does not impair the finality of the award.[108] The formula in the final award is so specific that the determination of the amounts by the AAA "is merely an accounting calculation." [109] In sum, the award was final, definite and complete.

■ Moreover, even if contrary to the foregoing, it could be said the award was not final or that it was incomplete or ambiguous, the Court holds that the Hunts waived such a claim. They acknowledge that, pursuant to 9 U.S.C. § 10(e), where an award is vacated and the time within which the agreement required the award to be made has not expired, the Court may "in its discretion, direct a rehearing by the arbitrators." The Hunts urge, however, that that period has expired since Rule 40 of the Commercial Arbitration Rules provides that an award shall be made no later than thirty days from the date of the closing of the hearings, and since the hearings were closed on September 27, 1985, the period for a rehearing has long since expired. Therefore, they contend that the Court is without power, at this time, to direct a rehearing so that the arbitrators

105. Whitaker Aff., Ex. 3, Award of Arbitrators (September 30, 1985) at 6.

106. *Id.*

107. Mook Aff., Ex. 60, Compensation Stipulation, para. 6.

108. *Cf. Hetherington & Berner, Inc. v. Melvin Pine & Co.*, 256 F.2d 103, 108 (2d Cir.1958); *States Marine Lines, Inc. v. Crooks*, 13 N.Y.2d 206, 245 N.Y.S.2d 581, 587, 195 N.E.2d 296 (1963).

109. *In re Hunter*, 274 A.D. 311, 312, 83 N.Y.S.2d 345 (1st Dept.1948).

could rectify the alleged ambiguities—in short, the arbitration was rendered "functus officio." If this position were upheld, it would mean seven years of arbitral activities of the parties, of their lawyers and the huge legal expenses incurred (of which the Hunts complain) would go down the drain and the arbitration would have to start from scratch. The Hunts, at no time before the end of the thirty-day period, which they now say was the outer limit for reconsideration and clarification of the award, asserted or made known their claim of lack of a final definitive award. Under all the circumstances of this case, this conduct amounts to a waiver of their claim. To hold otherwise would allow the Hunts to wait in ambush and then render wasteful years of effort at an expenditure of millions of dollars. A party "cannot remain silent, raising no objection during the course of the arbitration proceeding, and when an award adverse to him has been handed down complain of the situation of which he had knowledge from the first." [110]

Last, the Hunts, in an ad hominem attack upon the arbitrators and the AAA for their alleged misconduct, urge that this Court deny the arbitrators and the AAA the fees as calculated under the formula. Since the Court has rejected the Hunts' various charges, there is no basis for denial of the compensation and expenses due the AAA and the arbitrators.

A final matter remains, with respect to fees and costs, which involves certain of the Independents—to wit, Conoco, Grace Petroleum and Verba (collectively the "Conoco Group"), who, as previously noted, oppose confirmation of the award insofar as they are assessed a portion of the costs and fees of the arbitration. Grace Petroleum and Verba and all other parties to the arbitration (except Conoco and Hispanoil) signed the Compensation Stipulation which, among other matters, provided that the parties shall advance monies to the AAA

for payment of fees and costs, and that upon the conclusion of the proceeding the AAA would make the appropriate adjustment, including refunds, of any unexpended balance. Reference has already been made to the fact that the arbitration was stalled because of disputes as to the amount of the advances and charges until a number of the Majors made substantial overpayments and reserved their rights to recover any payments in excess of their allocable share from other parties to the arbitration (now included under the final award).

In January 1984, Conoco and other Independents negotiated settlements with the Majors and Occidental which were concluded in March 1984, at which time some of the Independents were in arrears in payments to the AAA for arbitrators' fees and disbursements. The settlements were reached near the conclusion of Phase I, which involved only the Hunts, the Majors and Occidental. In the process of consummating the settlement, the Majors and Occidental proposed a release which contained a provision specifically stating that the release did not affect the liability of the Independents for "costs, fees and related expenses" as may be assessed against them in the final award. The Independents objected and the releases were signed without the proposed provision. As executed, the releases contained the usual all inclusive terms of release, specifying that the release shall operate as a full and complete settlement and discharge of "any and all causes, claims, counterclaims, crossclaims, demands, actions, obligations, damages, or liabilities, whatsoever, whether known or unknown, that each of the other undersigned companies ever had, now has, or may hereafter have ... by reason of any fact or matter arising out of or relating in any way to the *Libyan Producers* Agreement...." [111] The Independents had

---

110. *Cook Indus., Inc. v. C. Itoh & Co. (America) Inc.,* 449 F.2d 106, 107–08 (2d Cir.1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972).

111. Duff Aff., Ex. A., Mutual Release (emphasis supplied).

sought to have the Majors indemnify them with respect to costs and fees, which they refused. The disputed matter was not resolved and the AAA continued to bill the Independents on a per capita basis, but they objected and made no payments. The Majors took the position that the Independents were properly billed.

The arbitrators in their final award formula for the purpose of allocating the total costs divided them into three parts, as previously noted. The award further provided that to determine the amounts of the fees and expenses of the arbitration, they were to be attributed to the periods when the services were performed and the expenses incurred as reflected by the statements submitted. Pursuant to this formula, assessments were made against Conoco and other Independents. The Conoco group object to that assessment, contending they were released from payments under the general releases executed in their favor by the Majors and Occidental. They also object that their participation in Phase I and Phase II, during which they were assessed under the arbitrators' formula, was de minimis and so they contend the assessments are excessive. Under Phase I, after a $2500 charge against Hispanoil, the balance was ordered divided equally among the fourteen parties to the arbitration, including Conoco, Veba and Marathon. Under Phase II, twenty-five percent of the costs was to be divided among the fourteen parties other than Hispanoil, which included the Conoco group; another twenty-five percent was to be divided equally among all the parties other than Hispanoil, Grace and Veba; and the remaining fifty percent to be divided equally among the Majors, Occidental and Hunt.[112] It is these assessments against them to which the Conoco group object in reliance upon the releases. However, the release specifies claims "arising out of or relating in any way to the Libyan Producers' Agreement." The obligation to pay fees and costs of the arbitration was under an entirely different agreement, the Compensation Stipulation. Verba and Grace were parties to this agreement. In this circumstance, the release does not extend thereto, but is limited to the parties' respective claims, cross claims, and obligations arising under the LPA. The LPA contained no provision for payment of fees and expenses of the arbitration; that obligation was imposed under the separate and independent Compensation Stipulation.[113]

A different situation exists as to Conoco, which was not a party to the Compensation Stipulation. As previously noted, whether the release that was signed on the settlement effected a discharge of fee obligation under the arbitration was a matter of dispute that was not resolved. The release did not purport by express language to extend to any such claim, but specifically released all obligations of whatsoever kind or nature under the LPA, which provided that disputes were to be settled by arbitration in accordance with the Rules of the AAA.[114] Thus, it cannot be said that the parties intended to release Conoco from any liability for the expenses of the arbitration that might be assessed by the arbitrators, who were authorized under the AAA rules to assess the expenses or any part thereof against any specified party or parties.[115] Further, it is contended on behalf of the Conoco Group that they did not participate in Phase I or II, or that their participation was de minimis. On this issue, even the Hunts, who take no position in the controversy between

---

**112.** Whitaker Aff., Ex. 3, Award of Arbitrators (September 30, 1985).

**113.** *See Herman v. Malamed,* 110 A.D.2d 575, 487 N.Y.S.2d 791 (1st Dep't 1985); *Lanni v. Smith,* 89 A.D.2d 782, 453 N.Y.S.2d 497 (4th Dep't 1982).

**114.** Mook Aff., Ex. 2, Libyan Producers' Agreement, para. 9(d).

**115.** Commercial Arbitration Rules § 51 (American Arbitration Association 1977).

the Conoco Group and the Majors and Occidental as to the assessment against Conoco and have not advanced any claim against these Independents, disagree and join with the Majors and Occidental in asserting that the "independent oil companies played an active and important role at crucial stages in the proceedings and received substantial benefits from their participation." [116]

Under all the circumstances, the assessment of fees was not foreclosed by the general release of the claims, counterclaims and cross claims asserted by parties under the LPA; the assessment was within the competence of the arbitrators.

A final word. The length of this opinion is due to the nature and the number of charges made by the Hunts. Consideration of each and every complaint of the Hunts upon which they rely for vacatur of the award, viewed against the totality of the extensive record before the arbitrators and upon which they rendered the award, compels the conclusion that the arbitrators were free from bias, prejudice, or actual or evident partiality against the Hunts, or to any other party to the arbitration, and that their determinations were based solely upon an impartial and objective consideration of the evidence and were rendered in accordance with their oath of office.

Surely this has been a long drawn out arbitration, extending over seven years, as well as an expensive one. Equally certain, this delay has been in large measure, if not entirely, due to the tactics of the Hunts. The record makes this crystal clear. When upon entry of the judgment in the antitrust suit, the stay was lifted and the parties directed to proceed with the arbitration, the Hunts embarked upon a campaign of obstruction to impede and defeat the arbitration. This attitude came to the surface when the first adverse ruling was made against them. The Hunts continued their tactics to the very end of the arbitration. The Court's references are not to vigorous advocacy on behalf of a client or to objections properly made, but to actions which, understated, can best be described as "nit picking." The Hunts have only themselves to blame for the excessive costs of this arbitration, which has resulted in great expense to other parties as well as to the Hunts. While it still remains true, "that as long as even a glint of hope remains for judicial interference with the merits of an arbitration award, we must regretfully anticipate continued efforts to press contentions similar to that rejected here," [117] hopefully this case may persuade others from pursuing such efforts.

In sum, the motions of the Hunts to vacate the award in its entirety is denied; the motions of Conoco, Grace Petroleum and Veba Oil to vacate the award insofar as it assessed fees and costs against them is also denied. The motion of the Majors and Occidental to confirm the awards is granted in all respects and judgment may be entered accordingly.

Submit proposed judgment upon five days' notice of settlement.

So ordered.

---

**116.** Plaintiffs' Memorandum in Reply to Statements of Grace Petroleum Corporation, et al., December 12, 1985 at 3.

**117.** *Andros Compania Maritima, S.A. v. Marc Rich Co., A.G.,* 579 F.2d 691, 704 (2d Cir.1978).